UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cv-24069-LENARD/Elfenbein

ADETOLA ILEGBUSI,

    Plaintiff,

vs.

UNIVERSITY OF MIAMI, a Florida not-for-profit corporation,

    Defendant.
_____/

**MOTION OF DEFENDANT, UNIVERSITY OF MIAMI, FOR IMPOSITION OF RULE 11 SANCTIONS AGAINST PLAINTIFF AND HIS COUNSEL**

Defendant, University of Miami (the "University"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 11, hereby moves for sanctions against Plaintiff, Adetola Ilegbusi, and his counsel, Christopher J. Rush and Christopher J. Rush & Associates, LLC, for filing and maintaining a frivolous claim against the University that is wholly without factual or legal support.

**PERTINENT FACTS**

Plaintiff is African American. In his Complaint, which is comprised solely of conclusory allegations, Plaintiff alleges that he became employed by the University effective November 14, 2022, as a Director of Privacy at the University, initially working remotely from New Jersey and then moving to Florida on January 1, 2023. A true and correct copy the University's October 11, 2022 offer letter to Plaintiff is attached hereto as **Exhibit A**. The letter, offering Plaintiff the position of a Director, HIPAA Privacy Compliance, specifically provides that it is not a guarantee of employment for any length of time and states that the position being offered is contingent upon, *inter alia,* "verification of previous employment and education."

Plaintiff alleges that his supervisor, Alyssa Lawrence, knew that he was one of two black members of the compliance department. Although, understandably, Plaintiff never explains how that fact is at all relevant, what Plaintiff fails to disclose is that, of course, Ms. Lawrence knew that Plaintiff was African American. Ms. Lawrence was the person who narrowed the applicant pool down to the final three candidates, all of whom identified as Black, Ms. Lawrence had face-to-face Zoom meetings with Plaintiff during the application/interview process and Ms. Lawrence is the person who ultimately hired Plaintiff. As explained below, those facts are extremely significant.

Plaintiff asserts that Ms. Lawrence discriminated against him based on his race by making certain comments to him during the course of his employment. Specifically, Plaintiff alleges that Ms. Lawrence, on one occasion, stated that she was surprised to see that Plaintiff drove such an expensive car and that she made comments to Plaintiff about his salary, stating that he was being paid too much. Plaintiff alleges that he told Ms. Lawrence that he intended to go to Human Resources and "inform them of his belief that [she] was discriminating against him." Plaintiff also alleges that Ms. Lawrence promised that Plaintiff would be evaluated at the 90-day mark but that she terminated him before he had been employed for 90 days. The comments Plaintiff attributes to Ms. Lawrence constitute the sum and substance of the alleged racial discrimination about which Plaintiff asserts he complained and/or threatened to complain. Moreover, the allegation that Plaintiff told Ms. Lawrence that he intended to go to Human Resources to report that he believed that she was discriminating against him constitutes the sum and substance of the "protected activity" in which he allegedly engaged.

Plaintiff alleges that his employment was terminated by the University on January 31, 2023, after less than ten weeks of employment. A true and correct copy of the January 31, 2023 letter to Plaintiff, terminating his employment, is attached hereto as **Exhibit B**. The termination

letter described Plaintiff's numerous performance deficiencies during his probationary period, his demonstrated lack of knowledge in privacy-related topics and the University's post-hiring discovery of misrepresentations Plaintiff had made, both during the interview process and on his resume, regarding his certifications (or, more accurately, lack thereof) in healthcare privacy compliance. In pertinent part, the termination letter stated:

> On November 19, 2022, you were hired as a Director, HIPAA Privacy Compliance in the Office of UHealth Compliance. As an exempt employee, you have a minimum probationary period of 180 calendar days. During your probationary period, we have had numerous conversations regarding performance related issues. Additionally, your performance has been evaluated and has reflected areas of concern. Specifically, you were counseled regarding your lack of demonstrated knowledge of Privacy-related topics, presentations skills, and inability to achieve goals independently. Additionally, during a budget meeting on January 30, 2023, you admitted that you had not started the coursework toward completing the required certifications as stated during your interview. Moreover, you indicated that you have a Certification in Healthcare Privacy Compliance (CHPC) on your resume. However, you have been unable to log into the CCB website to provide verification of the certification.
>
> Despite the provision of training and other resources, you continue to demonstrate significant deficiencies in your performance that make your continued employment with the University of Miami untenable. As a result of your unsatisfactory work performance during your probationary period, your employment with the University is terminated effective immediately.

Exhibit B. A copy of the resume provided to the University by Plaintiff in connection with his application for the HIPAA compliance position is attached hereto as **Exhibit C**.

Of the three candidates interviewed, Ms. Lawrence viewed Plaintiff as the top candidate because she believed the Department needed a HIPAA Privacy Compliance Director who was well-versed in information and data security. For that reason, believing Plaintiff to be that person, Ms. Lawrence agreed to meet Plaintiff's salary expectations and to offer him an annual salary of $195,000.00. That annual salary was $70,000.00 more than the previous Director for HIPAA Privacy Compliance, who was a white female. Ms. Lawrence also extended to Plaintiff a relocation

bonus of $10,000.00 and a sign-on/retention bonus of $10,000.00. However, Plaintiff's lack of training and knowledge in HIPAA compliance quickly became apparent once he commenced his employment.

By way of example, Ms. Lawrence had directed Plaintiff to present to Bascom Palmer leadership and faculty members on the University's new zero-tolerance policy in a Zoom meeting scheduled for January 18, 2023. Plaintiff was several minutes late to the meeting and, upon arrival, he rudely interrupted the host to advise of his presence. Although Ms. Lawrence had directed Plaintiff to present, he spoke only briefly and then delegated the task to his direct report, Nicholas Lancho, the Manager of Data Privacy. Following the presentation, Mr. Lancho was asked whether a medical provider is required to obtain patient consent to share the patient's medical information with another treating physician. Mr. Lancho replied that patient consent was required, looking to Plaintiff, who was supposed to be the subject matter expert, for confirmation. Plaintiff erroneously agreed with Mr. Lancho's response. Plaintiff should have been able to respond to this basic HIPAA question correctly, but he was not. Ms. Lawrence received a complaint concerning Plaintiff's lack of privacy-related knowledge from the leadership of Bascom Palmer Eye Institute, including from Joanne Martin, Associate Vice-President of Operations, and Michael Gittelman, Sr. Associate Vice-President of Operations.

Ms. Lawrence's concerns about Plaintiff's lack of privacy knowledge escalated when Plaintiff was asked whether a University employee who, as a side business, created software intended to assist with coding electronic medical data, could be given access to the University's medical files to test the software. Plaintiff responded that the employee could be given access if he signed a Business Associate Agreement. Ms. Lawrence was required to correct Plaintiff's erroneous response, as a Business Associate Agreement only is utilized when a third party is

providing the University with a service. Here, the employee's company would not be providing a service to the University and granting that person access to the University's medical records under such circumstances would be highly unethical.

On January 19, 2023, Jennifer Mendez, Bascom Palmer's Director, Business Operations, sent Ms. Lawrence an email, a copy of which is attached hereto as **Exhibit D**, asking her to schedule a 30-minute Zoom meeting with Ms. Martin and Mr. Gittelman to discuss the January 18, 2023, presentation and to arrange another Q & A session with Bascom Balmer leadership and faculty. Bascom Palmer's leadership expressed that they lacked confidence in Plaintiff's presentation and his ability to correctly answer the questions posed.

In addition to Plaintiff's demonstrated lack of privacy-related knowledge, he also exhibited significant deficiencies in his leadership skills and ability to complete substantive work. Among other things, Plaintiff failed to complete tasks assigned to him, he appeared distracted during training sessions and he consistently delegated to other members of the team work he should have completed himself. Team members expressed their concerns, both orally and in writing, to Ms. Lawrence about Plaintiff's performance and his privacy-related knowledge.

Plaintiff represented during his interviews and he stated in his resume that he had a Certificate in Healthcare Privacy Compliance, which he obtained in 2019, and that he anticipated receipt in 2022 of both his Certification as an Authorization Professional and his Certification as an Information Systems Security Professional. However, following his hiring, it was learned by the University that Plaintiff's Certification in Healthcare Privacy Compliance expired in 2021, about a year prior to his application to the University, and was never renewed. It also was discovered that, as of the end of January 2023, Plaintiff had not even commenced the coursework

necessary to obtain the other two certifications he listed on his resume and which he had represented he would receive in 2022.

On the morning of January 31, 2023, Alexandra Marban, the Director of Business Operations of UHealth Compliance, sent an email to Ms. Lawrance and to her boss, Julia Dean, explaining that, the prior day (January 30, 2023), she had met with Plaintiff regarding the FY24 Budget for the Privacy Department. A copy of that email is attached hereto as **Exhibit E.** Ms. Marban explained in her email that the purpose of her meeting with Plaintiff was to budget needs for licenses and certifications for each Director and his/her team. At that meeting, in discussing Plaintiff's licenses and certifications, Plaintiff stated that he had not started his certifications for the two certificates he had stated he anticipated receiving in 2022. Moreover, Plaintiff was unable to provide any proof that he held a Certification in Healthcare Privacy Compliance. Subsequently, the University learned that Plaintiff had not held such Certification since 2021.

The UHealth Privacy and Compliance Department serves as the first point of contact for all issues related to the HIPAA privacy and security standards for patient health information at the University. The functions of the Department include, but are not limited to, creating and maintaining applicable policies; maintaining high standards for the privacy and security of information; promoting a culture of privacy and confidentiality within the University; monitoring the privacy and security of health information throughout the University; supporting the University's efforts for HIPAA compliance as well as compliance with other laws and regulations regarding data privacy and security; leading data breach response and notification efforts; advocating for and supporting University efforts regarding the protection of personally identifiable information; and working with the University's Information Technology and Security Department regarding data privacy and security issues. The position of Director, HIPAA Privacy Compliance,

is of the utmost importance in fulfilling those Departmental functions, and it cannot be held by one who lacks the essential training and knowledge necessary. Plaintiff lacked that essential training and knowledge and, to obtain the position, he misrepresented his training and credentials.

A copy of the University's Discipline Policy, which became effective in April 2022 and remained in effect through the date of Plaintiff's termination, is attached hereto as **Exhibit F**. It provides, in pertinent part, that one example of misconduct which properly may result in disciplinary action, up to and including termination of employment, is "falsification, or omission of information on employment records." [Ex. F, p. 2, ¶ C]. Plaintiff clearly falsified his skills, knowledge and credentials in his interviews and on his resume in applying for the position of Director, HIPAA Privacy Compliance. This may explain Plaintiff's demonstrated lack of knowledge of basic principles of privacy, which became apparent just weeks into his employment. Plaintiff's employment properly was terminated during his probationary period.

## ARGUMENT

**I.    Plaintiff's Retaliation Claim under 42 U.S.C. § 1981 is Frivolous**

The relevant portions of 42 U.S.C. § 1981 state: "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white people." 42 U.S.C. § 1981(a). Section 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Melton v. 1010 Truck Center, Inc*., No. 3:21cv3061-MCR-ZCB, 2023 WL 9106967, at *7 (N.D. Fla. Nov. 28, 2023) (quoting *Jenkins v. Nell*, 26 F. 4th 1243, 1249 (11th Cir. 2022)). "To state a claim under 42 U.S.C. § 1981 a plaintiff must plead facts demonstrating: (1) that the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerns one or more of the activities enumerated in the statute (*i.e.,* the right to

7

make, perform, modify, and terminate contracts and enjoy 'all benefits, privileges, terms, and conditions of the contractual relationship')." *Al-Hakim*, 2019 WL 3805469 at *1 (quoting 42 U.S.C. § 1981(b)).

"Claims of employment discrimination under § 1981 may be based on disparate treatment, hostile work environment, or retaliation and are subject to the same standards of proof and analytical framework as claims under Title VII of the Civil Rights Act of 1964, as amended." *Melton,* 2023 WL 9106967, at *7 (citing *Yelling v. St. Vincent's Health Sys.,* 82 F. 4th 1329 (11th Cir. 2023) (analyzing a Section 1981 retaliation claim under the same framework as under Title VII)); *Gogel v. Kia Motors Mfg.,* 967 F. 3d 1121, 1134 (11th Cir. 2020) (stating that retaliation claims are cognizable under § 1981 and analyzed under the same framework as Title VII claims).

To state a claim for retaliation under Title VII (and, by extension, Section 1981), a plaintiff must plead that (1) he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and that (3) there is a causal relationship between the plaintiff's protected activity and the adverse employment action. *Candina v. Univ. of Miami*, 185 F. Supp. 3d 1343, 1351 (S.D. Fla. 2015). As to the requisite causal relationship, "[t]o prevail under § 1981, a plaintiff must initially plead and ultimately prove that, but for race, the plaintiff would not have suffered the loss of a legally protected right." *Dunston v. Gray Television, Inc.*, No. 1:21-CV-05032-MLB-JEM, 2024 WL 4224176, at *11 (N.D. Ga. Apr. 30, 2024) (citing *Comcast Corp. v. Nat'; Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020)).

Plaintiff has failed to plead, and cannot plead, the requisite elements of his Section 1981 retaliation claim. As a threshold matter, Plaintiff has failed to alleged that he engaged in statutorily-protected activity. As noted above, Section 1981 prohibits intentional race discrimination in the

8

making and enforcement of contracts. The entirety of Plaintiff's allegations with respect to what he contends constitutes his protected activity are as follows:

> Plaintiff was discriminated against because of his race (African American) in violation of 42 U.S.C. § 1981, as amended. Further, Plaintiff was victim of retaliation in violation of 42 U.S.C. § 1981, as amended, based upon the following:
>
> a. Manager AL knew Plaintiff was one of only two black members of the compliance department and commented that she "was surprised to see you (Plaintiff) in an expensive car." She then pointed out her husband drove a more expensive vehicle than Plaintiff.
> b. Manager AL early and often made several comments about Plaintiff's salary and stated that Plaintiff was being "paid too much."
> c. Manager AL also called upon [sic] another minority CISO employee an "idiot" who "couldn't get anything right in his department." Concurrently, AL noted that this minority CISO employee's supervisor, a white male, loved AL.
> d. Plaintiff told AL that he intended to go to Human Resources and inform them of his belief that AL was discriminating against him. AL informed Plaintiff on January 27, 2023 that AL had her supervisor (who hired Plaintiff) "wrapped around her finger" and AL said her supervisor (Julie Dean) "would do what AL told her to do." Plaintiff believed this comment was a threat.
> e. Previously, AL had promised that Plaintiff would be evaluated at the 90-day mark. Yet instead, AL terminated Plaintiff on January 31, 2023, just weeks before his 90-day period as promised.
> f. AL raised pretextual grounds for Plaintiff's discharge that were subjective and biased spins on events taken out of context to mask her racist and retaliatory motives.

[DE 1 ¶ 10]. Plaintiff incorporates the foregoing allegations into his retaliation claim and also states therein, in conclusory fashion, that he "made complaints of racial discrimination to AL" and that "[t]hese complaints constitute opposition to racial discrimination in the workplace and are protected under federal law." [DE 1 ¶¶ 11, 12]. Plaintiff is wrong on this point - - his allegations that he told AR that he intended to report suspected discrimination to Human Resources do not constitute opposition to racial discrimination and are not protected under federal law as a matter of law.

9

"To meet the requirement of engaging in protected activity, a plaintiff … must establish a reasonable and good faith belief that the discrimination existed." *Candina,* 185 F. Supp. 3d at 1351 (citing *Gupta v. Fla. Bd. of Regents*, 212 F. 3d 571, 586 (11th Cir. 2000)). "This is a two-pronged requirement with both subjective and objective components: A plaintiff must allege that her belief regarding discrimination was honest and in good faith; and must also establish that the belief, although mistaken, was nevertheless objectively reasonable." *Id.* (citing *Little v. United Technologies, Carrier Transicold Div.*, 103 F. 3d 956, 960 (11th Cir. 1997)). Thus, "a plaintiff must allege both that he honestly believed his employer was engaged in unlawful employment practices, and that his belief was objectively reasonable." *Ceus v. City of Tampa*, 803 Fed. App'x, 235, 245 (11th Cir. 2020). "Objective belief is measured against the controlling substantive law." *Id.*

Here, Plaintiff does not allege that AL used any racial slur or that Plaintiff heard AL make any other offensive race-based comment. Rather, he alleges that AL made a comment about the expensive car he drove, stated that another unidentified employee was an "idiot" and made comments to the effect that Plaintiff was being paid too much. [DE 1, ¶ 10]. Even taking these allegations as true, not a single comment that Plaintiff attributes to AL had anything to do with, or even remotely implicates, Plaintiff's race. Yet, even had AL actually made an isolated racist remark (which she clearly did not), a survey of binding precedent establishes that an isolated racist remark does not equate to an unlawful employment practice. *Johnson v. Family Practice and Injury Center, Inc.*, 437 F. Supp. 3d 1108, 1124 (M.D. Fla. 2020) (quoting *Smith v. Bottling Grp., LLC,* No. 8:16-cv-771-T-24MAP, 2016 WL 2944070, at *3 (M.D. Fla. May 20, 2016)). Moreover, "an employee may not invoke the protections of the statute 'by making a vague charge of discrimination.'" *Nasrallah v. Robert Half Int'l, Inc.*, No. 1:19-CV-00795, 2020 WL 1862657, at *9 (N.D. Oh. Apr. 14, 2020) (quoting *Fox v. Eagle Dist. Co., Inc.*, 510 F. 3d 587, 591 (6th Cir.

2007)). The statute "does not prohibit all distasteful practices by employers,' opposition to an employer's conduct is only protected … 'if it is opposition to a practice made an unlawful employment practice by [the statute].'" *Romero v. Franklin D. Azar & Assoc., P.C.,* No. 20-cv-00097-STV, 2020 WL 7640872, at *6 (D. Co. Dec. 22, 2020) (quoting *Peterson v. Utah Dep't of Corrs.,* 305 F. 3d 1182, 1188 (10th Cir. 2002)).

Nowhere in his Complaint does Plaintiff explain how the comments he attributes to AL violate Section 1981, as evaluated under Title VII standards. "Title VII does not protect an employee … if his opposition is merely a 'vague charge of discrimination.'" *Addison v. Servs. to Enhance Potential Western Wayne,* No. 17-11278, 2018 WL 7048462, at *4 (E.D. Mich. Nov. 27, 2018) (quoting *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F. 3d 634, 645 (6th Cir. 2015)). Where the conduct complained of is vague and does not, objectively, constitute an unlawful employment practice, a threat to report such conduct is not protected activity under the opposition clause. *Id.* In short, no reasonable person could have believed that the conduct about which Plaintiff complains in this lawsuit violated Section 1981 and, accordingly, Plaintiff has not reasonably alleged that he engaged in protected activity by threatening to bring such a complaint to Human Resources.

Based on Plaintiff's allegations relating to the element of causation, he appears to rely solely on temporal proximity between his alleged threat to report to Human Resources AL's alleged comments about his car and his salary (conduct which, even if taken as true, does not remotely meet the standard of "protected activity") and the termination of his employment. He alleges, in conclusory fashion, that he "opposed discrimination in the workplace" and that, four days later, he was terminated. [DE 1, ¶¶ 12, 13]. Plaintiff has failed to allege (and cannot allege)

11

the requisite causal connection between any alleged protected conduct and the termination of his employment.

To prevail on a Section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat. Ass'n of African American-Owned Media,* 589 U.S. 327, 341 (2020). The operative complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its fact under the but-for causation standard." *Id.* (quoting *Iqbal,* 556 U.S. at 678-79 (internal quotation marks omitted)). Plaintiff's Complaint fails to do so.

Further, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010), in turn quoting *Iqbal*, 556 U.S. at 682)). In *Doe*, for example, the Eleventh Circuit affirmed the dismissal of a discrimination complaint because there were "lawful explanations" for the plaintiff's suspension for sexual assault - - including "ineptitude, inexperience, and pro-complainant bias" - - that were "likelier" than gender discrimination (as alleged by the plaintiff). *Doe*, 29 F.4th at 689. Here, the allegations of the Complaint - - coupled with the attachments to the University's Motion to Dismiss, which control over contradictory allegations[1] - - make clear than the "obvious" and "likelier" explanation for Plaintiff's termination was his blatant fraud regarding his credentials and his incompetence.

---

[1] *See Caron Found. of Fla., Inc. v. City of Delray Beach*, 12-80215-CIV, 2012 WL 12855473, at *1 (S.D. Fla. June 6, 2012) ("[I]n ruling on a motion to dismiss, the Court considers the well-pleaded factual allegations, documents central to, referenced in, or attached to the complaint, and matters judicially noticed. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). If the exhibits contradict the allegations of the complaint, then the exhibits control. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).").

In addition, where (as here) a plaintiff relies on temporal proximity to establish causation, the "Eleventh Circuit has made clear that . . . a plaintiff's intervening act of misconduct severs the causal connection between the employee's [protected activity] and the decision to terminate her employment." *Feige v. Novitas Sols., Inc.*, 3:19-CV-395-MMH-MCR, 2023 WL 34712, at *10 (M.D. Fla. Jan. 4, 2023) (alterations in original) (collecting cases). Again, Plaintiff's misrepresentations and poor performance - - all of which was discovered during Plaintiff's probationary period[2] - - sever any casual connection between any of Plaintiff's alleged protected activity and his termination.

Finally, as noted above, the same individual (Alyssa Lawrence) hired and fired Plaintiff. Pursuant to the "same actor" doctrine, the law presumes that no discriminatory intent existed in cases where the hirer and firer are the same individual and the termination occurred shortly after the hiring. *See O'Brien v. Lucas Assocs. Pers., Inc.*, 127 Fed. Appx. 702, 707 (5th Cir. 2005) ("it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job") (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)). *See also Perez v. Pavex Corp.*, No. 8:01-CV-69-T-27MSS, 2007 WL 4105833, at *7 (M.D. Fla. Nov. 15, 2007) (recognizing inference "that the decisionmaker acted without discriminatory intent in cases where a defendant presents evidence that the hirer and firer are the same individual and the termination of employment occurred within a relatively short time following the hiring") (citing *Williams v. Vitro Services*

---

[2] The law is clear that "the failure to complete the probationary period is a facially legitimate, non-discriminatory reason for termination." *Valenzuela v. GlobeGround N. Am., LLC,* 18 So. 3d 17, 24 (Fla. 3d DCA 2009) (citing *Bicknell v. City of St. Petersburg*, No. 8:03-CV-1045-T-27, 2006 WL 560167, at *11 (M.D. Fla. Mar. 7, 2006) (failure to complete the probationary period is a facially legitimate, non-discriminatory reason for termination) and *Winegard v. W.S. Badcock Corp.*, No. 8:06-cv-1594T7TGW, 2008 WL 1848787, at *7 (M.D. Fla. Apr. 23, 2008) ("A company is not required by law to retain sub-par employees who under-perform their duties.")).

*Corp.*, 144 F.3d 1438, 1442-43 (11th Cir. 1998)). Clearly, the same actor doctrine wholly undermines Plaintiff's claim.

**II.     Rule 11 Sanctions are Warranted**

Fed. R. Civ. P. 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law . . . [or] (3) the factual contentions have evidentiary support." Rule 11 further provides that, if the Court determines that Rule 11(b) has been violated, it may impose an appropriate sanction on any attorney, law firm, or party responsible for the violation. Fed. R. Civ. P. 11(c)(1).

The purpose of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions and to deter costly meritless maneuvers." *Kaplan v. Daimler Chrysler, A.G.,* 331 F.3d 1251, 1255 (11th Cir. 2003). "Rule 11 sanctions are warranted . . . when a party files a pleading that has no reasonable factual basis." *Feingold v. Budner,* No. 08-80539-CIV, 2010 WL 917314, at *4 (S.D. Fla. Mar. 11, 2010) (citing *Didie v. Howes*, 988 F.2d 1097, 1104 (11th Cir. 1993)). "Rule 11 sanctions are also appropriate where the claims are objectively frivolous in view of the facts or the law." *Feingold*, 2010 WL 917314, at *4 (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996), *reh'g denied*, 99 F.3d 1157 (11th Cir. 1996)).

"In this circuit, a court confronted with a motion for Rule 11 sanctions first determines whether the party's claims are objectively frivolous – in view of the facts or law – and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous;

14

that is, whether he would have been aware had he made a reasonably inquiry." *Worldwide Primates, Inc. v. McGreat*, 87n F. 3d 1252, 1254 (11th Cir. 1996). "If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound." *Id*. In this case, Plaintiff's claim of retaliation in alleged violation of 24 U.S.C. § 1981 is objectively frivolous. The claim was asserted either in reckless disregard of the fact that it is devoid of both factual and legal merit or Plaintiff's counsel failed to make a reasonable inquiry as to the facts and applicable law. In either event, the imposition of Rule 11 sanctions is appropriate.

WHEREFORE, the University respectfully requests that the Court (1) impose sanctions against Plaintiff, Adetola Ilegbusi, and his counsel, Christopher J. Rush and Christopher J. Rush & Associates, LLC, for filing and maintaining this frivolous lawsuit, which sanctions should include an award of all reasonable expenses, including attorneys' fees, incurred by the University in connection with this action, including the preparation of this Motion; and (2) grant such further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Teresa Ragatz
    Eric D. Isicoff
    Florida Bar No. 372201
    Isicoff@irlaw.com
    Teresa Ragatz
    Florida Bar No. 545170
    Ragatz@irlaw.com
    Christopher M. Yannuzzi
    Florida Bar No. 92166
    Yannuzzi@irlaw.com

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was served (but not filed) via e-mail this 12th day of November, 2024, upon the following:

Christopher J. Rush
Christopher J. Rush & Associates, P.A.
Compson Financial Center, Suite 227
1880 North Congress Avenue
Boynton Beach, Florida 33426
Tel.: (561) 369-3331
Fax: (561) 369-5902
E-mail: crush@crushlawfl.com
E-mail: lmyers@crushlawfl.com

The Motion warned that it would be filed with the Court unless the "challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." *See* Fed. R. Civ. P. 11(c)(2). Plaintiff and his counsel failed to withdraw or appropriately correct Plaintiff's claims within the safe-harbor period. Accordingly, I **HEREBY CERTIFY** that, on this 10th day of December, 2024, a true and correct copy of the previously-served Motion was filed and served via CM/ECF.

By: /s/ Teresa Ragatz
    Teresa Ragatz