**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:24-cv-24069-LENARD/Elfenbein**

ADETOLA ILEGBUSI,

    Plaintiff,

vs.

UNIVERSITY OF MIAMI, a Florida not-for-profit corporation,

    Defendant.
_____/

**DEFENDANT'S REPLY STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, S.D. Fla. L.R. 56.1 and the Court's Order (D.E. 36), Defendant, University of Miami ("University"), hereby replies in support of its Statement of Undisputed Materials Facts (D.E. 35) submitted in support of its Motion for Final Summary Judgment (D.E. 34). Herein, the University addresses the Statement of Material Facts (D.E. 43) filed by Plaintiff, Adetola Ilegbusi ("Ilebgusi").[1] Attached hereto are the following materials:

(A)   The University's complete Equal Opportunity policy, attached hereto as Exhibit A.[2]

---

[1]   Ilegbusi's Statement totals approximately 11-and-a-half pages: 5 pages in response to the University's Statement and 6-and-a-half pages of additional facts (under the heading "Plaintiff's Statement of Undisputed Material Facts"). His Statement does not comply with S.D. Fla. L.R. 56.1(b)(2)(D), which provides, "The additional facts shall be separately titled as 'Additional Facts' and may not exceed five (5) pages." Further, his Statement does not comply with the Court's Order, which provides that "Plaintiff's Statement of Material Facts shall not exceed ten double-spaced pages," including any additional facts. (D.E. 36 at 3 ¶ 4.)

Given these violations, the Court could disregard Ilegbusi's Statement in its entirety. *See Campbell v. Allstate Ins. Co.*, No. 2:19-CV-14270-RLR, 2021 WL 148735, at *3 (S.D. Fla. Jan. 15, 2021) ("if a party fails to file a statement of facts that complies with Local Rule 56.1, then consistent with Federal Rule of Civil Procedure 56, the Court may strike the statement, grant relief to the opposing party, or enter other sanctions that the Court deems appropriate) (citing S.D. Fla. L.R. 56.1(d)). In *Campbell*, when faced with "summary judgment materials" that were "deficient and fail[ed] to comply with the Federal Rules of Civil Procedure, the Local Rules, and the Court's Order," the Court "deem[ed] each fact in [the Movant's] Statement of Facts true." *Id*. at *4.

Notwithstanding, because the Statement fails to identify any factual issue that would prevent entry of summary judgment in favor of the University, the University has addressed the Statement on its purported merits. The University respectfully submits that this Reply is compliant with both the Court's and the Local Rules' page limitations. However, to the extent this Reply exceeds any page limitations, that only is as a result of Ilegbusi's non-compliance, and the University respectfully requests leave of Court to accept this filing.

[2]   Ilegbusi attached a single page of the policy to his Statement as Exhibit B (D.E. 43-2). The University has filed the complete policy.

2

## **REPLY TO UNIVERSITY'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

8, 9.   Ilegbusi tries to change his own responses to the University's Requests for Admission and his own deposition testimony with a sham affidavit. The admissions speak for themselves. Further, in his deposition, Ilegbusi testified that, with respect to the CAP and CISSP certifications, he only discussed the CISSP certification briefly during his interview and stated that he had not completed the coursework for either:

> Q. Your resume, Exhibit 1, also provides that there were two other certifications which you anticipated receiving in 2022. One, the certified authorization professional certification [CAP] and two, the certified information systems security professional [CISSP] Do you see where I'm looking?
> A. I do, yes.
> Q. When you provided your resume and interviewed for the job at the University of Miami in the fall of 2022, you didn't tell anyone that you had not done the coursework to obtain either of those certifications, did you?
> A. It was the CISSP, the certified information systems security professional, that was actually -- that was discussed briefly, just that I was, you know, I was on the path of obtaining that certification, but yeah.
> Q. Did you ever obtain the certification?
> A. No.

(D.E. 35-1 at 30-31, Ilegbusi Depo. 29:7—30:1.) Ilegbusi's sham affidavit contends that he "did have CAP courses completed at the time of hire" and that he "investigated the CISSP" "[p]rior to assuming duties at UM." (D.E. 43-1 at 2-3 ¶¶ 5-6.) His sham affidavit also contradicts his document production; Ilegbusi did not produce any documents showing that he completed any CAP or CISSP coursework; that production is part of the University's pending Motion for Rule 37 sanctions. (*See* D.E. 41.) Also, given that Ilegbusi admittedly never has earned either certification (nor has he produced any information regarding what those certifications require), he does not have personal knowledge about what is necessary to obtain them and certainly cannot contradict Ms. Lawrence's and Ms. Dean's sworn testimony to the contrary. Finally, if Ilegbusi could easily

3

obtain these certifications, it begs several questions: Why did he never do so? Why would they result in a tremendous salary increase over his predecessor in the role? Why did none of the other finalists for the position have them?

12. Ilegbusi contends that he could have regained his CHPC certification after it expired "within weeks." Per the licensing board, Ilegbusi needed to re-take the exam and complete 40 education credits. (D.E. 35-1 at 161, Ilegbusi Depo. Ex. 14.) Per Ilegbusi's sham affidavit, he only re-obtained the CHPC certification in April 2025 - - nearly four years *after* it expired.[3] (*Compare* D.E. 35-3 at 4, Ilegbusi Interrog. Resp. 3 *with* D.E. 43-1, Ilegbusi Dec. ¶ 4.)

13. Ilegbusi's manufactured dispute is addressed in ¶¶ 8-9..

16. Ilegbusi purports to dispute the significance of his representations regarding his credentials in determining his salary, but the cited testimony supports the University's statement: "We [Ms. Lawrence and Ms. Dean] communicated with the compensation team upon his offer when he asked for significantly more money than the position was budgeted for. And they had to do a market review and determine whether his resume met his salary requirements, and based on his resume [which referenced his certifications] they agreed." (D.E. 35-8 at 54, Lawrence Depo. 53:18-25.)

19. Ilegbusi purports to dispute this statement but does not provide any counterevidence.

23. Ilegbusi purports to dispute this statement by claiming, in his sworn declaration, that he spoke with Ms. Dean fewer than five times and only once was his performance discussed. That does not rebut the University's statement that (1) Ilegbusi was coached about his performance issues by Ms. Lawrence since early on in his employment; and (2) Ms. Lawrence and Ms. Dean regularly discussed with each other their ongoing concerns about his poor performance.

---

[3] Ilegbusi failed to supplement his sworn interrogatory responses with this new information, notwithstanding the fact that discovery remained open through May 29, 2025, and the Court's Scheduling Order required timely supplementation. (*See* D.E. 23.)

29. Ilegbusi purports to dispute this statement but does not provide any counterevidence. Ms. Garcia-Delgado's testimony clearly supports that her Regulatory Team never had to answer Privacy questions until Ilegbusi became the Director of Privacy.

30. Ilegbusi purports to dispute this statement but mischaracterizes Mr. Lancho's testimony. Mr. Lancho testified that, after he and Ms. Garcia spoke with Ms. Lawrence about their concerns of Ilegbusi's performance, Ms. Lawrence "did not tell [him] to put anything in the email" and "did not advise [him] on any topics to write." (D.E. 35-6 at 12-16, Lancho Depo. 11:11—15:16.) Consistent with Ms. Lawrence's testimony, after Mr. Lancho "vented" his performance concerns, she "requested for [him] to put [those concerns] in writing" if he intended to report concerns. (*Id*.)

31, 32. Ilegbusi purports to dispute "the accuracy" of their performance concerns, but the sham affidavit on which he relies does not rebut anything in their contemporaneous e-mails. Ilegbusi has not identified any evidence that he exhibited anything but poor performance at the University.

33. Ilegbusi purports to dispute the fact that Ms. Lawrence had discussed her concerns about his performance with him and Ms. Dean, but the sham affidavit on which he relies does not rebut those facts. Ilegbusi also contends that he was "never counseled until January 23, 2023," but his failure to rebut ¶¶ 23-25 belies that contention; he clearly was counseled prior to that date.

35. Ilegbusi tries to change his own responses to the University's Requests for Admission and his own deposition testimony with a sham affidavit. (*See* ¶¶ 8-9.) Ilegbusi has presented no evidence to rebut the fact that, on January 30, he advised Ms. Marban that he had not started coursework for his CAP or CISSP certifications, and he could not verify his CHPC certification.

40. Ilegbusi purports to dispute this statement, but the statement is taken nearly verbatim from the University's sworn interrogatory responses. Ilegbusi provides no counterevidence.

42. Ilegbusi contradicts his own interrogatory responses with his sham affidavit. (*See* ¶ 12.)

5

45. Ilegbusi tries to change his own responses to the University's Requests for Admission and his own deposition testimony with a sham affidavit. (*See* ¶¶ 8-9.)

46. Ilegbusi's Appeal Form states that he did not appeal his termination based on misconduct; he appealed his ineligibility for rehire. (D.E. 35-1 at 162, Ilegbusi Depo. Ex. 15.) That Form states, "Employees who have been terminated for misconduct or rendered ineligible for future employment may choose to appeal" and that "any decision regarding the merits of the appeal shall be final and binding." (*Id.*) Ilegbusi admits he was terminated for misconduct and poor performance. (*See* ¶¶ 36-39.) Following its investigation, the University's decision was upheld. (D.E. 35-1 at 165, Ilegbusi Depo. Ex. 16.) Finally, Ilegbusi asserts that the "pool of candidates were all black," but that is not true. The three finalists were Black; however, the University received many applications, and the three finalists, by coincidence, were Black. (D.E. 35-9 at 3-4, Lawrence Dec. ¶ 7.)

52. Ilegbusi purports to dispute his own admission. Not only is his admission binding under Fed. R. Civ. P. 36(b), but his written statement also is admissible as an admission of a party opponent under Fed. R. Evid. 801(d)(2)(A),(D).

57. Ilegbusi contends that he is "without sufficient information" to address the portion of this statement regarding his performance issues and lack of integrity as compared to his replacement, Ms. Garcia, who did not have either performance or integrity issues. That response is insufficient to dispute those facts. *See, e.g.*, *Liu v. Univ. of Miami*, 138 F. Supp. 3d 1360, 1366 n.2 (S.D. Fla. 2015) ("Plaintiff responds to certain factual allegations indicating she is without knowledge of the facts and, therefore, denies them. The undersigned finds this response improper at this stage in the litigation. Plaintiff cannot simply deny facts because she is without knowledge, but must come forward with evidence disputing the facts."), *aff'd*, 693 Fed. Appx. 793 (11th Cir. 2017).

## ILEGBUSI'S ADDITIONAL FACTS

58. Undisputed[4] but immaterial.

59. Undisputed but immaterial.

60. Undisputed.

61. Disputed, in part. The job description included the items listed by Ilegbusi under "Core Qualifications," but the job description also included other duties or requirements. (D.E. 35-1 at 146-150, Ilegbusi Depo. Ex. 10.) The job description also notes that it is "not intended to be all-inclusive and may be expanded to include other duties or responsibilities as necessary." (*Id*.)

62. Disputed, in part. Ilegbusi held the CHPC certification from August 16, 2019, through August 31, 2021. (D.E. 35-3 at 4, Ilegbusi Interrog. Resp. 3.) To the extent Ilegbusi is suggesting that, due to COVID-19, he was unable to complete his continuing education credits for his CHPC certification or to obtain his CAP or CISSP certifications, he fails to support that suggestion with any evidence. Nor has he provided proof that he completed any coursework. (*See* ¶¶ 8-9.)

63. Undisputed. However, Ms. Kulhanjian held a CIPP/U.S. privacy certification. (*See* ¶ 1.)

64. Undisputed.

65. Disputed. Ilegbusi does not cite any evidence for his claim that Julia Dean told him he had one year to obtain his certifications. To the contrary, Ms. Dean repeatedly testified that, during the hiring process, Ilegbusi represented that he "was already working on those certifications [CAP and CISSP] and his resume indicated he would have those completed in 2022." (D.E. 35-7 at 20-21, Dean Depo. 19:20—20:21.) Ilegbusi "represented he was almost complete with them and that he would have them in 2022." (*Id*. at 27:24—28:19.) "[W]e [Ms. Lawrence and Ms. Dean] specifically asked him, does that mean you are going to have those completed in 2022 and he told

---

[4] The University does not dispute statements for purposes of summary judgment only.

us yes." (*Id*. at 29:19-21.) However, in January 2023, he "told my budget person [Alexandra Marban] that he had not even started on those at all. They take more than a year to get and he wanted us to budget for him to take the courses. He had not even started them and had, you know -- he didn't have them, had not even started them and we were already in 2023 when his resume indicated he would have them finished in 2022. And he told us he had a current privacy certification [CHPC] which he also didn't have." (*Id*. at 19:20—20:21.) Finally, the last part of Ilegbusi's statement cites to an unauthenticated e-mail (mistakenly cited as Exhibit E but likely meant to cite Exhibit D), in which Ms. Lawrence inquires about Ilegbusi's background check because it "turns out that he lied about the certifications on his resume and [Ms. Lawrence] was curious if he lied about other parts of his resume or experience." (D.E. 42-4.) The recruiter's statement that the job description allowed the candidate "12 months to receive the proper certifications" misses the point. What matters is that Ilegbusi <u>lied</u> about his credentials. (*See* ¶ 45.)

66.     Undisputed but immaterial.

67.     Disputed, in part. The cited deposition testimony states that Ms. Lawrence said Ilegbusi had a "nice" and "expensive" car, and he also equivocated about whether Ms. Lawrence said her husband had "a nicer version or a nicer model of the car, or had a nicer car." Regardless, none of these comments had anything to do with Ilegbusi's race; he expressly testified that he "interpreted her words" to mean that he "had no place driving" that kind of car. (*See* ¶¶ 47, 49.)

68.     Disputed. (*See* ¶¶ 16, 48, 49, 51.)

69.     Disputed in part; Ilegbusi mischaracterizes the policy. The policy states that harassment (as relevant here) must be "based on race" and "create a work environment that would be intimidating, hostile or offensive to a reasonable person." (Ex. A.) Ilegbusi never has asserted a claim of harassment or hostile work environment, either while employed or in this lawsuit. (*See* ¶¶ 47-50.)

70. Disputed in part, as to the existence and substance of the "complaint." (*See* ¶¶ 49-51.)

71. Disputed in part, as to the existence and substance of the "complaint." (*See* ¶¶ 49-51.) Ilegbusi testified that he threatened to report three comments to HR: (1) "one comment when [Ms. Lawrence] took [Ilegbusi] to lunch about [his] car"; (2) a "comment about DEI but that is nowhere found in [his] appeal statement" and (3) "some comment about [Ilegbusi] being a black guy." (D.E. 35-1 at 79, Ilegbusi Depo. 78:1-16.) As he testified, "those were the three comments." *Id*.

72. Disputed. Ilegbusi's alleged lack of awareness that his CHPC certification had lapsed does not change the fact that he represented he had a current CHPC certification when, in fact, he did not. (*See* ¶¶ 4, 8, 10, 12, 20, 35, 41-45.) In fact, Ms. Dean specifically testified that Ilegbusi's alleged beliefs were irrelevant: "Q. So if Tola truly believed he still held that CHPC, is that still an intentional resume fraud to you? A. Yes." (D.E. 35-7 at 28-29, Dean Depo. 27:24—28:3.)

73. Undisputed.

74. Undisputed. However, Ilegbusi only attached a portion of the e-mail chain to his Statement. The full version, in which Ilegbusi acknowledges Ms. Lawrence's concerns about his work performance, can be located at D.E. 35-1 at 151-153 (Ilegbusi Depo. Ex. 11).

75. Disputed in part, insofar as Ilegbusi fails to cite anything specific nor is there any support that criticism was "unabated." Ms. Lawrence counseled Ilegbusi about performance issues throughout his employment and discussed same with Ms. Dean. (*See, e.g.*, ¶¶ 23-27.)

76. Disputed. This statement is not supported by the cited deposition testimony. Ilegbusi never "directly accused" Ms. Lawrence of discrimination; the only comments he allegedly threatened to report had nothing to do with his race and do not constitute discrimination. (*See* ¶¶ 49-51, 71.)

77. Disputed. This statement is not supported by the cited excerpts or any record evidence.

78. Disputed; the circumstances surrounding the e-mail are discussed in ¶ 65 above.)

79. Disputed in part, as Ilegbusi appeal his ineligibility for rehire. (*See* ¶ 49.)

80. Disputed in part. Ilegbusi mistakenly cites Exhibit D but likely meant to cite Exhibit B. The full version of the Policy makes clear that harassment/discrimination (as relevant here) must be "based on race" and affect "the terms and conditions and/or privileges of employment." (Ex. A at 1-2.) Supervisors "are authorized to receive complaints of discrimination," as are "Human Resources partners." (*Id*. at 5) Ilegbusi's "complaint" was not harassment/discrimination or based on race. (*See* ¶¶ 69-71.) It also defies logic and common sense that an employee would report discrimination *to the same supervisor* that allegedly was discriminating against him (rather than to another management official or human resources). Admittedly, Ilegbusi never did so. (*See* ¶ 50.)

81. Disputed, in part. Ilegbusi mischaracterizes Mr. Lancho's testimony. (*See* ¶¶ 30, 32.) Further, Mr. Lancho was Ilegbusi's subordinate and was not a decisionmaker. (*See* ¶¶ 5, 40.)

82. Undisputed but immaterial. As Ilegbusi fails to rebut, Ms. Garcia was selected because, unlike Ilegbusi, she had worked for Ms. Lawrence for years and did not have any performance or integrity issues. (*See* ¶ 57.)

83. Disputed, in part. Ilegbusi mischaracterizes Ms. Garcia's testimony. (*See* ¶¶ 30, 31.) Further, Ms. Garcia was Ilegbusi's subordinate and was not a decisionmaker. (*See* ¶¶ 5, 40.)

84. Undisputed but immaterial, given Ms. Delgado-Garcia's position. (*See* ¶ 29.)

85. Undisputed but immaterial, given Ms. Delgado-Garcia's position. Ms. Delgado-Garcia held a lateral position to Ilegbusi and was not a decisionmaker. (*See* ¶¶ 15, 40.)

86. Disputed, in part. Ms. Lawrence discussed Ilegbusi's salary during the hiring process and when she explained to Ilegbusi that, due to budget constraints resulting from how much he was being paid, the department could not afford to hire anyone else. (D.E. 35-8 at 27-28, Lawrence Depo. 26:15—27:22.) The remaining statements are undisputed but immaterial.

87. Disputed in part. As Ilegbusi admits, Ms. Lawrence counseled Ilegbusi about performance issues throughout his employment and discussed same with Ms. Dean. (*See, e.g.*, ¶¶ 23-27, 75.) The remaining statements are undisputed but immaterial.

88. Disputed. Ilegbusi blatantly mischaracterizes the document (which he fails even to cite) as well as Ms. Lawrence's deposition testimony. The disciplinary notice states:

> Tola has also not demonstrated integrity. When we interviewed Tola, his resume stated that he had certifications in progress [CAP and CISSP, anticipated 2022]. He verbally told us he had progress on both of these certifications and would be able to complete them within 12 months. Our Director, Business Operations asked him for information on these certification as part of our FY24 budgeting process. . . . He admitted to her he has not started any coursework toward these certifications as stated during his interview. He also stated he held a [CHPC] but could not log in the CCB website to provide verification of having the CHPC certification and we cannot verify the certification without his written consent.

(D.E. 35-1 at 158-158, Ilegbusi Depo. Ex. 13) In her deposition - -without any prompting - - Ms. Lawrence testified that she "misunderstood the question" and then unequivocally testified, "I thought he was supposed to have the two Infosec {CAP and CISSP] certifications by December 2022 when he was hired. That's what he put on his resume, and I expected he already had the CHPC." (D.E. 35-8 at 12, Lawrence Depo. 11:11-25.) Because the CAP and CISSP certifications take at least a year to obtain, Ilegbusi could not have "anticipated" getting them at the end of 2022 unless he already had made substantial progress on them at the time of his interview. (*See* ¶ 9; *see also* D.E. 35-7 at 29, Dean Depo. 28:13-19.)

89. Disputed, in part. The University's sworn interrogatory answer makes clear that, while Ms. Lawrence made the decision, she consulted with Ms. Dean and Ms. Stone, who reviewed the decision and received approval for same from Ms. Feanny. (*See* ¶ 40.) When Ilegbusi appealed, the decision was reviewed and approved by Workplace, Equity and Performance. (*See* ¶ 53.)

90.     Undisputed but immaterial. Ilegbusi admits that his CHPC had expired more than a year before he started working at the University, at no point during his employment did he hold the CHPC; and an expired certification means not certified. (*See* ¶¶ 4, 8, 10, 12, 20, 35, 41-45, 72.)

91.     Disputed in part, as Ms. Dean, Ms. Lawrence, and HR determined Ilegbusi's salary, and his credentials were a factor. (*See* ¶ 16.) The remaining statements are undisputed but immaterial.

92.     Disputed. Ilegbusi blatantly mischaracterizes Ms. Dean's testimony. Ms. Dean testified that, for her, the bigger issue was Ilegbusi's misrepresentations regarding his CAP and CISSP certifications. (D.E. 35-7 at 28-29, Dean Depo. 27:14—28:11.) However, Ms. Dean also testified that he also misrepresented his privacy knowledge, which manifested itself in his poor performance on the job. (*Id*. at 52:2-23.) Further, when Ms. Dean was shown Ilegbusi's termination letter - - which summarized his misrepresentations and poor performance - - she confirmed that she agreed with everything in the letter, that those were the "grounds for termination" and that those grounds were discussed among Ms. Dean, Ms. Lawrence and Human Resources. (*Id*. at 52:24—53:17, D-Ex. 1.) The remaining statements are undisputed and immaterial.

93.     Disputed. Ilegbusi blatantly mischaracterizes Ms. Dean's testimony. Ms. Dean testified that, for her, the bigger issue was Ilegbusi's misrepresentations about the CAP and CISSP, but his misrepresentations about the CHPC was fraud, too: "Q. So if Tola truly believed he still held that CHPC, is that still an intentional resume fraud to you? A. Yes and -- but for me, it was more about the CAP and the CISSP because we specifically told him in the interview process that that was a skill gap on our team that we were looking to fill." (D.E. 35-7 at 28-29, Dean Depo. 27:14—28:11.) She also made clear that Ilegbusi's lack of integrity related to his misrepresentations as to all three certifications. (*Id*. 19:14—20:21.)

94.     Disputed. Ilegbusi blatantly mischaracterizes Ms. Dean's testimony. (*See* ¶ 93.)

Respectfully submitted,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Christopher M. Yannuzzi
    Eric D. Isicoff
    Florida Bar No. 372201
    Isicoff@irlaw.com
    Teresa Ragatz
    Florida Bar No. 545170
    Ragatz@irlaw.com
    Christopher M. Yannuzzi
    Florida Bar No. 92166
    Yannuzzi@irlaw.com

**CERTIFICATE OF SERVICE**

I **HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via CM/ECF this 15th day of August, 2025, upon the following:

Christopher J. Rush
Christopher J. Rush & Associates, P.A.
Compson Financial Center, Suite 227
1880 North Congress Avenue
Boynton Beach, Florida 33426
Tel.: (561) 369-3331
Fax: (561) 369-5902
E-mail: crush@crushlawfl.com
E-mail: lmyers@crushlawfl.com

        By: /s/ Christopher M. Yannuzzi
            Christopher M. Yannuzzi