**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 24-24069-CIV-LENARD/ELFENBEIN

**ADETOLA ILEGBUSI**,

      Plaintiff,

v.

**UNIVERSITY OF MIAMI**,

a not-for-profit corporation.

      Defendant,

_____/

**UNIVERSITY OF MIAMI,**

      Counter-Plaintiff,

**v.**

**ADETOLA ILEGBUSI,**

      Counter-Defendant.

_____/

<u>**OMNIBUS ORDER**</u>

THIS CAUSE is before the Court on the Defendant/Counter-Plaintiff's Renewed

Motion for Final Summary Judgment ("U.M.'s Motion for Summary Judgment") (D.E. 73)

filed by Defendant/Counter-Plaintiff University of Miami ("U.M.") and the Counter

Defendant's Motion for Summary Judgment ("Ilegbusi's Motion for Summary Judgment")

(D.E. 75) filed by Plaintiff/Counter-Defendant Adetola Ilegbusi ("Ilegbusi"). Both motions

have been fully briefed and both matters are now ripe. Having considered the pleadings, the docket, and otherwise being fully informed, the Court finds as follows.

## I.      Background

### a.  Factual Background

In the autumn of 2022, U.M. advertised the position of Director of HIPAA Privacy Compliance ("Director"). D.E. 74 at ¶2; D.E. 86 at ¶2. The advertisement required the successful applicant to hold a privacy certification within 12 months of hire. D.E. 74 at ¶2; D.E. 86 at ¶2. The Director would report to Executive Director UHealth Privacy and Compliance Alyssa Lawrence ("Lawrence"). *Id*. Lawrence reported to Chief Compliance and Privacy Officer Julia Dean ("Dean"). Lawrence and Dean determined that the ideal candidate would hold at least one privacy certification. *Id*. Both Lawrence and Dean are white.

Ilegbusi, a black man, applied for the position and was interviewed via Zoom videoconference by Lawrence and Dean on September 23, 2022. D.E. 74 at ¶3-4; D.E. 86 at ¶3-4. Ilegbusi represented in his Resume ("Resume") (D.E. 70-1) and in his interview that he was, as of 2019, Certified in Healthcare Privacy Compliance (CHPC), and anticipated becoming a Certified Authorization Professional (CAP) and Certified Information Systems Security Professional (CISSP) by the end of 2022. D.E. 74 at ¶3, 7; D.E. 74-2 at ¶3; D.E. 86 at ¶3, 7.

On October 11, 2022, U.M. offered Ilegbusi the position, with a salary set at $195,000. D.E. 74 at ¶9; D.E. 86 at ¶9. Ilegbusi's salary was $70,000 more than that of his

predecessor. D.E. 74 at ¶1; D.E. 86 at ¶1. The offer of employment was conditioned on, inter alia, verification of previous employment and education. D.E. 74 at ¶10; D.E. 86 at ¶10. Ilegbusi accepted the offer and began working for U.M. on November 14, 2022. D.E. 74 at ¶10, 14; D.E. 86 at ¶10, 14. Ilegbusi began his work remotely before moving to Miami in early January 2023. D.E. 86 at ¶69. Like all of U.M.'s new hires, Ilegbusi was placed on a 180-day probationary period. D.E. 74 at ¶15; D.E. 86 at ¶15. His core jobs functions included: (1) managing HIPAA directives; and (2) educating the workforce about privacy risks. D.E. 74 at ¶16; D.E. 86 at ¶16.

On January 18, 2023, Ilegbusi and his subordinate, Nicholas Lancho ("Lancho"), made a presentation at U.M.'s Bascom Palmer Eye Institute. D.E. 74 at ¶18; D.E. 86 at ¶18. Answering a question from an attendee, Lancho provided an incorrect answer, which Ilegbusi supported. *Id.* Ilegbusi concedes that someone in the Director position should have known the correct answer to the question. *Id.* Several Bascom Palmer members complained to Lawrence about Ilegbusi's lack of privacy knowledge. D.E. 74 at ¶19; D.E. 86 at ¶19.

On January 23, 2023, Lawrence had a conversation with Ilegbusi relating to a series of deficiencies in Ilegbusi's performance and goals for improvement. D.E. 74 at ¶21; D.E. 86 at ¶21. On January 25, 2023, Lawrence memorialized this conversation in a series of emails with Ilegbusi. *Id.* Also on January 25, Ilegbusi and Lawrence participated in a call with a Dr. Kenyon, during which Ilegbusi provided an incorrect answer to a HIPAA-related question about granting access to medical records. D.E. 74 at ¶20; D.E. 86 at ¶20. Lawrence

corrected Ilegbusi's answer and advised him that granting medical records under the circumstances of the question would be "highly unethical." *Id*.

On January 27, 2023, two of Ilegbusi's subordinates, Lancho and Rachel Garcia ("Garcia"), emailed Lawrence with concerns relating to Ilegbusi's performance and knowledge of healthcare privacy. D.E. 74 at ¶25-26; D.E. 86 at ¶25-26. Ilegbusi does not dispute that Lancho and Garcia sent these emails but disputes the truth of their content. D.E. 86 at ¶25-26.

On January 30, 2023, during a budget meeting with Alexandra Marban ("Marban"), Ilegbusi requested $4,000 for him to take a course to obtain the CISSP, as he had not started the coursework for that certification. D.E. 74-1 at 52-55. At the same meeting, Marban asked him for a copy of his CHPC, however, Ilegbusi was unable to provide his certification. *Id*. at 55-56.

On January 31, 2023, Ilegbusi's employment was terminated. D.E. 74 at ¶29; D.E. 86 at ¶29. The parties dispute the reason for Ilegbusi's termination, and this dispute forms the crux of this case. U.M. claims that Ilegbusi was terminated for poor performance and misrepresentation of his credentials. *See* D.E. 73. Ilegbusi contends that this basis was pretextual and that he was fired in retaliation for opposing Lawrence's unlawful racial discrimination. *See* D.E. 85.

### b. *Lawrence's Comments to Ilegbusi*

On or around January 26, 2023, Ilegbusi claims that he complained to Lawrence that he believed she was discriminating against him on the basis of his race and that he intended to complain to human resources about the same. D.E. 86 at ¶79. Ilegbusi claims that the basis of his belief was several comments related to his race. *Id*. at ¶74. The racial comments, as set forth by the Second Amended Complaint (D.E. 56) are as follows: (1) after observing Ilegbusi drive a Mercedes-Benz car, Lawrence "condescendingly stated" that she was surprised to see him drive a nice car, but that her husband drove a nicer car ("Car Comment"); (2) Lawrence told Ilegbusi he was "the black guy" in the department ("Black Guy Comment"); (3) Lawrence repeatedly told Ilegbusi that she believed he was being paid too much, and once attributed this to the fact that he was a DEI hire ("Salary Comment");[1] and (4) Lawrence described another minority employee as an idiot and questioned how he obtained his role ("Idiot Comment"). D.E. 56 at 3. Ilegbusi further claims that Lawrence told him she had her supervisor, Dean, "wrapped around her finger." *Id*.

U.M. disputes that Lawrence made any of these comments to Ilegbusi and disputes that Ilegbusi claimed he would go to human resources. D.E. 70 at 11. However, for the sake of ruling on U.M.'s Motion for Summary Judgment, the Court takes Ilegbusi's allegations here as true.

---

[1] The Court understands "DEI" to reference Diversity, Equity, and Inclusion measures.

c. *Procedural Background- Second Amended Complaint*

Ilegbusi filed the Second Amended Complaint on September 17, 2025, alleging one count of retaliation in violation of 42 U.S.C § 1981. D.E. 56. On October 1, 2025, U.M. timely filed Defendant's Motion to Dismiss Second Amended Complaint (D.E. 57), alleging Ilegbusi failed to state a claim for relief. *See* D.E. 57. After the Motion to Dismiss was fully briefed, the Court entered an Order (D.E. 68) denying the motion and finding that Ilegbusi had alleged sufficient factual material to plausibly state a retaliation claim. U.M. then filed its Answer, Affirmative Defenses and Counterclaim ("Counterclaim") (D.E. 70) on January 12, 2026, denying Ilegbusi's allegations and bringing two counts against Ilegbusi.[2]

On February 12, 2026, U.M. filed U.M.'s Motion for Summary Judgment and Defendant/Counter-Plaintiff's Statement of Undisputed Material Facts in Support of Renewed Motion for Final Summary Judgment (D.E. 74). U.M.'s Motion for Summary Judgement argues that there is no genuine dispute of material fact and that U.M. is entitled to summary judgment for several reasons: (1) Ilegbusi admitted in Plaintiff's Responses to Defendant's First Request for Admissions ("Ilegbusi's Admissions") (D.E. 74-2) that "during [his] employment with [U.M.], [he] never raised any complaints of discrimination to anyone employed by [U.M.][,]" which U.M. argues forecloses Ilegbusi's retaliation claim; (2) Ilegbusi has offered multiple and inconsistent versions of his story, and argues

---

[2] The Court addresses the procedural posture of the Counterclaim in Section I(d) below. *See infra* at 7-9.

that summary judgment is appropriate where a party's story is so internally inconsistent that no reasonable jury could credit it; (3) Ilegbusi cannot establish a prima facie case for retaliation as he did not engage in a statutorily protected activity and cannot show causation; (4) U.M. can show legitimate, nondiscriminatory reasons for Ilegbusi's termination; and (5) the fact Lawrence both hired and fired Ilegbusi creates a presumption that the termination was not retaliatory. D.E. 73 at 5-18. U.M. further argues that it is entitled to summary judgment on its Counterclaim. *Id*. at 18-21.

Ilegbusi filed Plaintiff/Counter Defendant's Memorandum of Law in Opposition to Defendant/Counter Plaintiff's Renewed Motion for Final Summary Judgment (D.E. 85) and Counter Defendant/Plaintiff's Responses to Counter Plaintiff/Defendant's Statement of Undisputed Material Facts and his Statement of Material Facts (D.E. 86) on March 13, 2026. Therein, Ilegbusi argues that there is a material dispute of facts, that he should be permitted to amend Ilegbusi's Admissions to retract his admission, that his claims are not inconsistent, that he has established a case for retaliation and that the record as a whole contains sufficient evidence that U.M. retaliated against him. D.E. 85 at 2-17. He further argues that U.M.'s reasons for termination are pretextual. *Id*. at 9-12. Finally, Ilegbusi argues that U.M. is not entitled to summary judgment on its Counterclaim. *Id*. at 18-20.

U.M. filed Defendant/Counter-Plaintiff's Reply in Support of Renewed Motion for Final Summary Judgment (D.E. 89) and Defendant/Counter-Plaintiff's Reply Statement of Facts in Support Renewed Motion for Final Summary Judgment (D.E. 90) on March 20,

2026. U.M. repeats its arguments from U.M.'s Motion for Summary Judgment. *See* D.E. 89.

### d. Procedural Background- Counterclaim

In its Counterclaim, U.M. sets forth two counts: (I) fraudulent misrepresentation; and (II) negligent misrepresentation. D.E. 70 at 11-12. U.M. argues that Ilegbusi misrepresented his credentials when applying for the Director position, that Ilegbusi knew or should have known of the falsity of the representations, that U.M. relied on these representations, and that it suffered damages as a result. *Id*. Ilegbusi filed Adetola Ilegbusi's Answer to University of Miami's Counterclaim (D.E. 72) on February 2, 2026, denying that he misrepresented his credentials during the hiring process. D.E. 72.

On February 12, 2026, Ilegbusi filed Ilegbusi's Motion for Summary Judgment and Counter Defendant's Statement of Undisputed Material Facts in Support of his Motion for Summary Judgment (D.E. 76), arguing that he did not misrepresent any past or present material fact and that U.M. cannot show that he did. D.E. 75 at 3-6. Ilegbusi argues that the fact he did not possess the CHPC did not factor into his U.M.'s decision to hire him and that his statement that he "anticipated" receiving the CISSP and CAP by the end of 2022 cannot form the basis of a misrepresentation claim as it is a promise of future performance. *Id*. at 4-6. He argues that any potential misrepresentation was unconnected to U.M.'s decision to hire him, and that thus, U.M. has not suffered any damages as a result of the misrepresentation. *Id*. at 6-7.

U.M. filed Defendant/Counter-Plaintiff's Response in Opposition to Plaintiff/Counter-Defendant's Motion for Final Summary Judgment (D.E. 81) and Defendant/Counter-Plaintiff's Response to Plaintiff/Counter-Defendant's Statement of Material Facts in Support of his Motion for Summary Judgment (D.E. 82) on February 27, 2026. U.M. argues that the undisputed record reflects Ilegbusi's made several material misrepresentations, and that U.M. relied on these misrepresentations to its detriment. D.E. 81 at 7-11.

Ilegbusi filed Counter Defendant's Reply in Support of his Motion for Summary Judgment (D.E. 83) and Counter Defendant's Reply Statement of Material Facts in support of his Motion for Summary Judgment (D.E. 84) on March 9, 2026, in which he repeats his arguments from Ilegbusi's Motion for Summary Judgment. *See* D.E. 83.

## II.    Applicable Law

Per 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). This establishes three requirements for a discrimination claim under § 1981: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004). "Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are

analyzed under the same framework as Title VII claims." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020).

"Title VII recognizes two forms of statutorily protected conduct. An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020). "[A] plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997).

Title VII "shields an employee from retaliation regardless of the merit of her complaints so long as she can show a good faith, reasonable belief that the challenged practices violate Title VII." *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). A plaintiff's burden under this standard contains both subjective and objective components. "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960.

"To establish the necessary causation, a plaintiff must demonstrate that 'her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gogel*, 967 F.3d at 1135. Where an employer has provided a legitimate, non-discriminatory reason for the adverse action, the employee "must meet that reason head on and rebut it" in order to show that the reason was pretextual. *Id*. at 1136.

Summary judgment is appropriate where there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "When a moving party has discharged its burden, the non-moving party must then

11

'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). To survive summary judgment in a retaliation case, the plaintiff must "come forward with evidence—not speculation or conjecture—from which a jury could conclude that the County retaliated against him for engaging in protected activity." *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1311 (11th Cir. 2026).

However, "[s]ummary judgment…may *also* be appropriate where 'the [party's] story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Williams v. Mallet*, 707 F. Supp. 3d 1340, 1346 (S.D. Fla. 2023) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). A court "may disregard self-serving testimony that is 'blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed.'" *Id*.

"To establish intentional racial discrimination, an employee may rely on either direct evidence or circumstantial evidence. If the employee 'presents direct evidence that, if believed by the jury, would be sufficient to win at trial,' summary judgment is inappropriate." *Melton v. I-10 Truck Ctr. Inc*, 166 F.4th 905, 913 (11th Cir. 2026) (citations omitted). "If, by contrast, the employee relies on circumstantial evidence to support his claim, 'we generally apply the *McDonnell Douglas* burden-shifting framework.'" *Id*.; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973).

12

However, establishing a prima facie case through the *McDonnell Douglas* framework is only one means through which a plaintiff can defeat summary judgment, and failing to demonstrate a prima facie case is not fatal to a claim. "Rather than lose by default, the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court, therefore, should advance directly to the convincing mosaic inquiry." *Ismael v. Roundtree*, 161 F.4th 752, 765 (11th Cir. 2025).

With respect to the convincing mosaic inquiry, the Eleventh Circuit has identified three "nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

However, whether applying the *McDonnell Douglas* framework or the convincing mosaic framework, the summary judgment standard is nevertheless the same. A plaintiff must still put forward enough evidence for a reasonable jury to conclude that illegal retaliation occurred. *See Melton*, 166 F.4th at 915 ("[T]he same evidence placed in a looser frame does not transform it into something new.").

### III.    Analysis

#### a.  Ilegbusi's Admissions

First, the Court takes up the issue of Ilegbusi's admission that "during [his] employment with [U.M.], [he] never raised any complaints of discrimination to anyone employed by [U.M.]." D.E. 74-2 at ¶25. Ilegbusi argues that he should be permitted to withdraw this admission and amend his answer to deny the statement. D.E. 85 at 2-5. U.M. argues that Ilegbusi should be held to this admission, and that this admission forecloses his claim. D.E. 89 at 10.

The Court first notes that courts have construed opposition to motions for summary judgment as a motion to withdraw admissions when "doing so would facilitate a merits-based resolution of an otherwise genuinely disputed issue of fact and the admitting party, in substance if not by motion, retreats from the admission." *Metalizing Tech. Servs., LLC v. Berkshire Hathaway Specialty Ins. Co.*, No. 22-20596-CIV, 2022 WL 2805320, at *7 (S.D. Fla. June 9, 2022).

Rule 36(b) provides a two-prong test through which a court may permit a party to withdraw or amend its admissions: (1) permitting the withdrawal or amendment would promote the presentation of the merits of the action; and (2) the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on its merits. Fed. R. Civ. P. 36(b). However, even where a party requesting withdrawal meets both prongs, a district court, in its discretion, may still deny the request. *Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1264-1265 (11th Cir. 2002).

Here, permitting the withdrawal would facilitate the presentation of this case on its merits. Ilegbusi has, since his original Complaint (D.E. 1) alleged that he complained to Lawrence that he believed she was discriminating against him on the basis of his race. *See* D.E. 1. Further, Ilegbusi's claim that the admission was given in error is reflected by Ilegbusi's Admissions. Paragraphs 24 and 25 of Ilegbusi's Admissions repeat the same statement: "Admit that during your employment with the University, you never raised any complaints of discrimination to anyone employed by the University." D.E. 74-2 at ¶24-25. Ilegbusi denies paragraph 24 and admits to paragraph 25. Based on this, Ilegbusi's admission to paragraph 25 plainly appears to be a clerical error.

As for the second prong of the test, the Court notes that a defendant's burden in showing prejudice goes beyond that it simply has to defend the case on the merits. *Apple Inc. v. Corellium, LLC*, No. 19-81160-CV, 2021 WL 2712132 at *4 (S.D. Fla. June 30, 2021). "Rather, it relates to the difficulty a party may face in proving its case, *e.g.,* caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions." *Smith v. First Nat. Bank of Atlanta*, 837 F.2d 1575, 1578 (11th Cir. 1988) (citing *Brook Village North Assoc. v. General Elec. Co.,* 686 F.2d 66, 70 (1st Cir.1982)).

U.M. has not identified actual prejudice that it would face as a result of Ilegbusi's request for amendment. Instead, U.M. argues that allowing Ilegbusi to amend shortly before trial would clearly prejudice U.M. *See* D.E. 89 at 4. To this end, U.M. cites *Corellium*, in which the District Court denied a defendant's request to amend an admission

15

shortly before trial. *Corellium, LLC*, 2021 WL 2712132 at *4. However, in *Corellium*, the plaintiff had justifiably relied on the defendant's admission and had conducted discovery on the assumption that the admission was reliable. *Id*.

In the present case, the record reflects that U.M. did not rely on the admission when conducting discovery and certainly knew the admission was the result of error. *See Perez*, 297 F.3d at 1267-1268 ("Perez had been engaging in discovery all along, albeit with some resistance by the County, and had only relied on the admissions for six days….Certainly, allowing an amendment or withdrawal at that early point would not have created a 'sudden need' for Perez to obtain evidence.").

U.M.'s argument that Ilegbusi should be held to the erroneous admission is thus not to protect itself from prejudice but to circumvent the presentation of Ilegbusi's case on its merits. "Rule 36 is a time-saver, designed 'to expedite the trial and to relieve the parties of the cost of proving *facts that will not be disputed at trial*.'" *Id*. at 1268. Rule 36 was intended as a shield to protect litigants who rely in good faith on opposing parties' admissions, and not a sword an opportunistic litigant can use to attack an opponent.[3] *Id*.

---

[3] Further, U.M.'s argument that since Ilegbusi was dilatory in finding the error, he should not be permitted to withdraw his admission is unpersuasive. *See Perez*, 297 F.3d at 1265 ("Although the motion to withdraw admissions is, as the parties acknowledge, directed to the sound discretion of the court, the discretion should not be exercised in terms of the defaulting party's excuses, but in terms of the effect upon the litigation and prejudice to the resisting party.") (cleaned up).

Therefore, the Court finds that Ilegbusi has met the two-prong test in Rule 36(b) and, given his contradictory statements in paragraphs 24 and 25, exercises its discretion to allow Ilegbusi to amend his admission to deny paragraph 25 of Ilegbusi's Admissions.

### b. Ilegbusi's Claim on its Merits

The Court now looks to whether Ilegbusi has established a case for retaliation. The Court begins by noting that Ilegbusi does not proffer direct evidence of retaliation and does not attempt to establish a prima facie case under the *McDonnell Douglas* framework. *See* D.E. 85 at 5-7. However, his claim does not fail here. *Ismael*, 161 F.4th at 761-762. Ilegbusi avers that he can present a convincing mosaic of evidence to avoid summary judgment. D.E. 85 at 7. Specifically, Ilegbusi argues that that he has presented sufficient evidence of his opposition to Lawrence's alleged comments constitute opposition to racial discrimination and that his termination was causally linked to his opposition to this protected act.

### 1.   Statutorily Protected Activity

The Court first analyzes Ilegbusi's claim that he engaged in a protected act by opposing unlawful employment discrimination, namely, the comments made by Lawrence. Ilegbusi has presented no evidence, beyond his own testimony, that any of his allegations actually occurred. Even after discovery, Ilegbusi has turned up no further evidence to substantiate his claim that Lawrence made these comments or that U.M. retaliated against him for his intention to complain to human resources. Apparently, nobody but him heard

17

Lawrence's comments and nobody but Lawrence was aware of his intent to complain to human resources. Lawrence and U.M. have consistently denied Ilegbusi's allegations.

Nevertheless, at the summary judgment stage, the Court draws all inferences in favor of the non-moving party and construes all evidence in the light most favorable to him. Accordingly, the Court takes as true: (1) that Lawrence made the Car Comment, Black Guy Comment, Salary Comment, and Idiot Comment to Ilegbusi; and (2) that Ilegbusi told Lawrence he intended to go to human resources with his complaint. However, even drawing these inferences in Ilegbusi's favor, he still has not presented sufficient evidence that he engaged in a protected activity.

To show that he engaged in a protected activity by opposing unlawful racial discrimination, Ilegbusi need not prove racial discrimination but must show that his belief that he was being discriminated against was both subjectively in good faith and objectively reasonable. Little, 103 F.3d at 960. U.M. does not argue that Ilegbusi lacked a subjectively good faith belief that he was being discriminated against, but argues that Ilegbusi's belief he was being discriminated against was not objectively reasonable. D.E. 73 at 8-11.

To analyze the reasonableness of Ilegbusi's belief that he was being discriminated against, the Court looks at each comment in turn. First, the Car Comment, while rude, does not remotely implicate race and thus is not counted. The same is true of the Idiot Comment. The Salary Comment, specifically, Lawrence's attribution of Ilegbusi's salary to Ilegbusi being a "DEI hire," could potentially implicate race. However, Ilegbusi's own deposition

18

testimony undermines his argument that the Salary Comment was racially discriminatory. The Court finds the following excerpt enlightening:

> Q: Isn't it a fact that any comment Ms. Lawrence made about your salary was made in the context of the University's inability to pay the salary you wanted to fill the two vacant positions in the department?
>
> A: No. I think you asked me that earlier. I said…I was not aware…the salaries of the two positions were contingent on my salary. The conversations that she had regarding my salary was…comparing with, I guess, my predecessor and saying that she felt I was being paid too much. That it was too high of a salary. But you know, she said something like, thanks to DEI or DEI opportunity or something. She mentioned in that conversation that my salary was—in comparison was much higher but due to DEI, like, it was okay.

D.E. 74-1 at 74. Here, Ilegbusi's own testimony refutes the allegation that Lawrence called him a "DEI hire." D.E. 56 at 3. The Salary Comment, as told by Ilegbusi, reflects no racial animus, does not necessarily imply race, and Ilegbusi's belief that he was being discriminated against because of the comment was not an objectively reasonable belief.[4]

---

[4] The Court is further unaware of binding legal authority that holds that vague references to DEI constitute evidence of racial discrimination, and is doubtful of the proposition that such references would. Diversity, equity, and inclusion is defined by dictionary.com as "a conceptual framework that promotes the fair treatment and full participation of all people, especially in the workplace, including populations who have historically been underrepresented or subject to discrimination because of their background, identity, disability, etc." https://www.dictionary.com/browse/dei. First, this definition makes clear that DEI can relate to a number of characteristics that may or may not be protected characteristics. This alone likely makes blanket references to DEI too broad and unspecific to form the basis of an objectively reasonable perception of racial discrimination.

Finally, the Black Guy Comment, while being the only comment to explicitly mention race, does not rise to the level of racial discrimination. *See Dorvil v. Advance Stores Co.*, No. 10-60036-CIV, 2011 WL 6069362, at \*14 (S.D. Fla. Dec. 6, 2011) ("However, not every comment addressing a plaintiff's protected characteristics create an inference of discrimination."). This comment, although touching on race, does not meet the standard of discrimination, and the belief that it was racially discriminatory is not objectively reasonable. *See Small v. City of Hollywood*, 661 F. Supp. 3d 1187, 1205 (S.D. Fla. 2023) ("If Betton did make the statement that "African Americans are lazy," this was indeed an "uncalled for, ugly, racist statement" ….But without more, this single racially derogative remark does not rise to the level of an unlawful employment practice.). Here, the only remark Ilegbusi can point to that even mentions race is not objectively racially derogatory.[5]

For all of these comments, the Court notes that Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *See also Harrison v. Belk,* 748 F. App'x 936, 943 (11th Cir. 2018) ("The Supreme Court has stressed that Title VII provides no protection against 'those petty slights or minor annoyances that often take place at work and that all employees experience.'").

---

Second, the stated purpose of DEI is to promote fair treatment and full participation of all people, including those who face underrepresentation or discrimination. The suggestion that merely recognizing the effects of DEI is racist would undermine the cogency of the conceptual framework.

[5] Even if the Court were to find that this comment was racially discriminatory, Ilegbusi nevertheless fails to show a causal link between the alleged discrimination and his termination. *See infra* at 21-27.

Therefore, because none of Lawrence's comments support an objectively reasonable belief that Ilegbusi was being unlawfully discriminated against on the basis of his race, the Court finds that Ilegbusi did not engage in a statutorily protected activity by complaining of racial discrimination. As a matter of law, Ilegbusi's claim for retaliation fails. Nevertheless, for the sake of thoroughness, the Court continues its analysis.

### 2. Causation

U.M. contends that Ilegbusi cannot show that his termination was causally linked to his complaint of racial discrimination. D.E. 73 at 11-14. Ilegbusi argues that the close temporal proximity between his complaint and his termination, the pretextual justification for his termination, and differentiating comparators are sufficient evidence to show causation. D.E. 85 at 8-9, 11.

First, the Court looks to Ilegbusi's argument that the proffered reasons for his termination are pretextual. Ilegbusi argues that U.M. has provided multiple contradictory reasons for his termination and argues that he did not misrepresent his credentials. *Id*. at 9-12.

The termination notice ("Termination Letter") (D.E. 70-3), proffers two reasons for Ilegbusi's termination, performance issues and misrepresentation of his credentials. D.E. 70-3 at 2. Ilegbusi claims that Lawrence, in her deposition, stated that Ilegbusi was fired only for misrepresentation of his credentials. D.E. 85 at 9. Ilegbusi's assertion is not a complete rendition of the deposition testimony. In her deposition, Lawrence stated, "I believe he misrepresented his credentials which is why he was terminated ultimately then

and we did wait for 30 days [sic]. However, his performance concerns were connected to the lack of certifications so it was not left out of the letter. It was relevant." D.E. 74-8 at 48. Lawrence's deposition does not contradict the Termination Letter, which she also signed.[6] D.E. 70-3 at 2.

Ilegbusi also contends that Dean's deposition testimony contradicts the Termination Letter. D.E. 85 at 9. This statement is also a misrepresentation. In her testimony, Dean stated, "For me, it was more about the CAP and the CISSP because we specifically told him in the interview process that that was a skill gap on our team we were looking to fill. And he represented to us that he would have those certifications by the end of the year." D.E. 74-7 at 28. Dean's concern, as stated in her deposition testimony, was primarily Ilegbusi's representations about his certifications on his Resume and in his interview. However, Lawrence, not Dean, drew up the Termination Letter, which specifically referenced both the misrepresentations of credentials and poor work performance as reasons for Ilegbusi's termination. That Dean was more concerned about Ilegbusi's

---

[6] U.M. notes that Lawrence, who knew Ilegbusi was black when she hired him, also fired him. D.E. 73 at 18. U.M. argues that this creates a presumption of non-discriminatory intent, citing *Williams v. Vitro Servs. Corp.* for this proposition. *Id*. A closer reading of *Vitro* refutes this argument. In *Vitro*, the Eleventh Circuit stated, "where the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual." *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1442 (11th Cir. 1998). Essential here is that the "same actor doctrine" is an inference, not a presumption. The Eleventh Circuit further stated that it declines "to accord to this 'same actor' factual circumstance a *presumption* that discrimination necessarily was absent from the decision to terminate Williams. We nonetheless believe that these facts may give rise to a *permissible inference* that no discriminatory animus motivated Vitro's actions." *Id*. at 1443. Accordingly, the same actor doctrine is an inference that a jury at trial may draw. At the summary judgment stage, since all inferences are drawn in the non-moving party's favor, the same actor doctrine does not avail U.M.

statement that he would obtain the CAP and CISSP prior to the end of 2022 than she was about his misrepresentations regarding CHPC or his poor performance does not create a discrepancy.

Ilegbusi's contention that since he did not misrepresent his credentials during the hiring phase is belied by his own admissions and testimony. Ilegbusi admits that he represented on his Resume that he stated he held the CHPC and anticipated receiving the CAP and CISSP before the end of 2022. D.E. 70-1 at 2; D.E. 74 at ¶7; D.E. 74-2 at ¶2,4,6; D.E. 86 at ¶7. Ilegbusi admits he made the same representations in his interview with Lawrence and Dean. D.E. 74 at ¶7; D.E. 74-2 at ¶3,5,7; D.E. 86 at ¶7. Ilegbusi also admits that he did not hold the CHPC when he applied for the Director position and did not procure the CISSP or CAP certifications in the timeframe he claimed he would. D.E. 74 at ¶34; D.E. 74-2 at ¶16-17; D.E. 86 at ¶34. Thus, Ilegbusi misrepresented his certifications.

Ilegbusi downplays the significance of each of these misrepresentations but does not deny their truth. He states that he previously held the CHPC, but that it had expired, unbeknownst to him. D.E. 85 at 10. That Ilegbusi once held the CHPC or that he was unaware that it expired is irrelevant. He represented that he held the certification, yet he did not. Ilegbusi further claims that since the job posting for the Director position stated he would have a year to obtain the CISSP and CAP certifications, it is immaterial that he did not procure the certifications before the end of 2022. *Id*. This argument misses the mark for the same reason.  Ilegbusi represented on his Resume and in his interview that he would hold both certifications by the end of 2022, yet he did not. Ilegbusi had not even started the

coursework for the CISSP certification by January 30, 2023. D.E. 74-1 at 54-55. The undisputed facts in this case show that Ilegbusi misrepresented his certifications.

Ilegbusi's argument is likewise unavailing with respect to the other reason for his termination. Ilegbusi downplays the significance of his underperformance and contends that on January 25, 2023, Lawrence told him he would have 30 days to improve his performance. D.E. 85 at 8. However, Ilegbusi does not deny the underlying fact that he *was* underperforming. D.E. 74 at ¶18-21; D.E. 86 at ¶18-21. As U.M. correctly notes, Ilegbusi was not entitled to 30 days to improve his performance. He was midway through his probationary period. A period during which he failed to meet expectations at work and during which his misrepresentations of his credentials were discovered. Either reason is sufficient to terminate Ilegbusi's employment. *See Dulaney v. Miami-Dade Cnty.*, 481 F. App'x 486, 490 (11th Cir. 2012) ("an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'").

In considering Ilegbusi's pretext argument, the Court considers the precedent of *Melton* instructive. *Melton,* 166 F.4th 905 (11th Cir. 2026). In *Melton*, a black plaintiff brought a claim of retaliation against his former employers after he faced disparate treatment and racially derogatory remarks including slurs from his coworkers, his supervisors, and his boss. *Id*. at 910-912. The plaintiff participated in a protected activity by complaining of the discrimination. *Id*. at 912.

However, the plaintiff was unable to show that his "protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. at 916. The plaintiff proffered evidence that the defendants' reasons were pretextual, including a manager's statement that he "planned to get rid of [the plaintiff]," and the promotion of a racist coworker to the position of supervisor. *Id*. However, he nevertheless failed to put forward evidence that the "proffered reasons were so 'weak, implausible, inconsistent, incoherent, or contradictory' [such] that a 'reasonable factfinder could find them unworthy of credence[.]'" *Id*. (cleaned up). Because of this, the plaintiff was unable to show pretext. *Id*.

In affirming the district court's grant of summary judgment in favor of the defendants, the Eleventh Circuit stated, "Melton must still 'put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred.' He has not done so." *Id*. (citations omitted).

In the present case, Ilegbusi attempts to show pretext based on U.M.'s "shifting and varied" explanations for his termination. D.E. 85 at 9. Yet, at every turn, his allegations of shifting explanations are belied by the record. Instead of showing pretext, the undisputed facts show that Ilegbusi: (a) misrepresented his credentials; and (b) underperformed in his official job duties. Ilegbusi *admits* to both. D.E. 74 at ¶18-21, 34; D.E. 86 at 18-21; 34. For these reasons, Ilegbusi has not shown pretext.

Ilegbusi's comparator evidence is also defeated by the undisputed record. Ilegbusi contends that both his predecessor and his successor, neither of whom are black, did not possess the CHPC, CAP, or CISSP certifications, and all served at least one year. D.E. 85

25

at 11. However, this is not true comparator evidence. Neither of these individuals represented that they held any of the foregoing certifications when they did not. Ilegbusi's argument, again, glosses over the fact that he misrepresented his qualifications.

Ilegbusi contends that the temporal proximity between his complaint to Lawrence on January 27, 2023, and his termination on January 31, 2023, provides further circumstantial evidence of causation. D.E. 85 at 14-15. While close temporal proximity can serve as circumstantial evidence in the convincing mosaic framework, the undisputed record in this case indicates that U.M., through its employees Lawrence and Dean, first learned of Ilegbusi's misrepresentations within this period. On January 30, 2023, during a yearly budget meeting with Marban, Ilegbusi requested $4,000 be set aside for the purposes of taking a course necessary to take the CISSP test, as he had not begun the coursework. D.E. 74-1 at 54-55. In the same meeting, Ilegbusi was unable to provide proof that he held the CHPC certification when requested. *Id*. at 56.

The record reflects that on January 30, U.M.'s employees discovered that Ilegbusi did not hold the CHPC and had not procured the other certifications in the timeframe he claimed he would. He was terminated for this misrepresentation the next day for this reason, in addition to his poor work performance. Because of this, the causal chain was broken. *Berry*, 84 F.4th at 1309 (We have explained that 'very close' temporal proximity between a protected activity and an adverse action can create an inference of causation….But the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity.").

### 3. Unconvincing Mosaic

In the present case, Ilegbusi has argued that he is able to show a convincing mosaic of evidence that would allow a reasonable jury to find in his favor. The substance of this mosaic, however, is little more than a smorgasbord of perceived slights and speculative retaliatory intent. Ilegbusi is apparently under the misconception that the *Melton* Court sought to dispel: that evidence that would be woefully insufficient under the *McDonnell Douglas* framework could form a convincing mosaic. *Melton*, 166 F.4th at 915 ("[T]he same evidence placed in a looser frame does not transform it into something new.").

Whatever metaphor or framework Ilegbusi intended to use, the burden on summary judgment to come forward with *evidence* remains the same. *Berry,* 84 F.4th at 1309 ("But inferences in favor of [an employee] can be based only on evidence—not on speculation."). Instead, the undisputed record shows that Ilegbusi was not fired because he was black or because he lacked certain certifications. He was fired because he claimed to hold certifications when he did not, and because he was bad at his job. The truthfulness of U.M.'s proffered reasons for termination is borne out by Ilegbusi's own stipulated facts and deposition testimony.

### c. *Summary Judgment on the Counterclaim*

Both parties argue that they are entitled to summary judgment on U.M.'s Counterclaim. D.E. 73 at 18-22; D.E. 75 at 3-9. The elements of fraudulent misrepresentation are: (1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) the intention that the representation induce

27

another to act on it; and (4) consequent injury by the party acting in reliance on the representation. *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. Dist. Ct. App. 2011). The elements of negligent misrepresentation are identical except that the alleging party needs only show that the representer "negligently failed to ascertain the truth or falsity of the representation." *Hasenfus v. Secord*, 962 F.2d 1556, 1561 (11th Cir. 1992). Here, neither party has carried their burden.

U.M. has not set forth sufficient undisputed facts to show Ilegbusi's misrepresentations were material. In order to show that the misrepresentations were material, U.M. must show that it would not have hired Ilegbusi but for the misrepresentations. *Ribak v. Centex Real Est. Corp.*, 702 So. 2d 1316, 1317 (Fla. Dist. Ct. App. 1997). Merely that Ilegbusi was chosen over other candidates that did not claim to hold the same certifications, or that he was paid more than his predecessor, are insufficient to show that Ilegbusi's misrepresentations were material when taking the facts in the light most favorable to Ilegbusi.

Similarly, Ilegbusi cannot show, when viewing the facts in the light most favorable to U.M., that his misrepresentations were not material to his hiring. Ilegbusi argues that the CHPC misrepresentation was not material because Dean stated in her deposition that she was more concerned with the CAP and CISSP than with the CHPC. D.E. 74-7 at 28. However, Dean was only one of the individuals involved in hiring Ilegbusi.

Further, Ilegbusi argues that his statements regarding the CAP and CISSP could not form the basis of a misrepresentation claim as they were not statements regarding a past or

28

present fact, and his statements were promises of future performance. D.E. 75 at 3. However, this argument also falls flat. While actionable misrepresentation must normally concern a past or present fact, this rule is not without exception. Specifically, an exception exists "where the promise to perform a material matter in the future is made without any intention of performing or made with the positive intention not to perform." *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1372 (Fla. Dist. Ct. App. 1981).

Ilegbusi's argument that U.M. is barred from making this argument since it was not raised in the Counterclaim is also unavailing. D.E. 83 at 4. The purpose of a complaint is to set forth the factual basis for a claim, not to exhaust legal arguments. U.M. is not barred from arguing that the *Vance* exception applies, because it is a theory of liability, not a type of claim. *McCreight v. AuburnBank*, 117 F.4th 1322, 1326-1327 (11th Cir. 2024).

For these reasons, neither party is entitled to summary judgment on the Counterclaim, and this case will proceed on Counts I and II of the Counterclaim alone.

## IV.    Conclusion

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the

U.M.'s Renewed Motion for Final Summary Judgment (D.E. 73) is **GRANTED** on Count I of the Second Amended Complaint (D.E. 56) and **DENIED** on Counts I and II of the Counterclaim (D.E. 70). The Court will enter Final Judgment by separate order after the conclusion of the case. The Motion for Summary Judgment (D.E. 75) filed by Adetola

Ilegbusi is **DENIED** in its entirety. The Court will set the trial on Counts I and II of the

Counterclaim by separate order.

      **DONE AND ORDERED** in Chambers at Miami, Florida this 22nd day of July

2026.


                       **JOAN A. LENARD**
                        **UNITED STATES DISTRICT JUDGE**

30